*622 OPINION OF THE COURT
Daniel F. Luciano, J.
The petitioners, Stephen Cangelosi and Victoria Cangelosi, coconservators for their adult, mentally retarded daughter, have brought a petition before this court seeking permission to transfer the proceeds remaining from a compromise of a medical malpractice action into a supplemental needs trust.* The reason for the requested placement of these funds into such a trust is the contention that the conservatee, Kristen Cangelosi, upon her transfer from the main facility of the Maryhaven Center of Hope to a group home of Maryhaven Center of Hope, an intermediate care facility for the mentally retarded, become entitled to transfer the money to a supplemental needs trust and become eligible to have Medicaid pay the cost of her room and board at the intermediate care facility. In the alternative the petitioners, Stephen Cangelosi and Victoria Cangelosi, will be required to spend down the remaining proceeds of the compromised action to the minimal limits which will thereupon render the conservatee, Kristen Cangelosi, eligible for Medicaid coverage.
The respondent, New York State Department of Social Services, contends that any such transfer would violate Federal and State statutes and regulations against the transfer of resources without consideration and result in the conservatee’s, Kristen Cangelosi, ineligibility to have Medicaid cover her living expenses at the intermediate care facility.
A dispute arises as to whether in accordance with the Medicare Catastrophic Coverage Act as modified by the Medicare Catastrophic Coverage Repeal Act the conservatee, Kristen Cangelosi, is by her conservators, Stephen Cangelosi and Victoria Cangelosi, entitled to transfer assets without consideration and remain eligible for Supplemental Security Income (SSI) and Medicaid. The issue, in the first instance, is one of statutory construction.
The key question is whether the conservatee, Kristen Cangelosi, is an institutionalized individual exempt from the transfer of assets rule and the parties have argued the merits of both sides of this issue.
*623 The primary bases for the respective arguments may be found in an opinion by Justice Fred T. Santucci dated January 14, 1992 in Matter of Aspinall (NYLJ, Jan. 23, 1992, at 27, col 4), and the respondent’s, New York State Department of Social Services, "sur reply memorandum of law in further opposition to the petition”.
First, Justice Santucci found as follows (Matter of Aspinall, supra, at 27, col 5):
"The conservatee is a resident at an intermediate care facility which by definition is an institution. (42 USCA § 1396d [d].) It does not follow, however, that he is an institutionalized individual: The subsection containing the restriction on the transfer of assets contains its own definition of 'institutionalized individual’ which provides, in part, 'an individual who is an in-patient in a nursing facility * * * [or] a medical institution * * * [or] who is described in section 1396a [a] [10] [A] [ii] [VI] of this title’. (42 USCA § 1396p [c] [3].) An intermediate care facility is not included in the definition. Clearly, it is not included in the term nursing facility. An intermediate care facility is one with the primary purpose of providing health and rehabilitative services to mentally retarded individuals. (42 USCA § 1396d [d].) A nursing facility is primarily intended to provide skilled nursing care, rehabilitation for the injured or the sick or regular health care and other services to individuals who because of their physical or mental condition can only receive such service in an institutional setting. (42 USCA § 1396r [a].) While a nursing facility might care for a mentally retarded person, it is clearly a different facility from an intermediate care facility. This conclusion is reinforced by the fact the legislation requires nursing facilities to annually review the condition of their mentally retarded residents specifically to determine whether the level of care at an intermediate care facility might be sufficient (42 USCA § 1396r [e] [7] [B] [ii].)
"This conclusion that a resident of an intermediate care facility is not institutionalized presents an anomalous situation. An individual who receives care at home or through community-based service and, but for that service, would require the level of care available at an intermediate care facility may be an 'institutionalized individual’ [,] (42 USCA §§ 1396a [a] [10] [A] [ii] [VI], 1396p [c] [3]) while residence in such facility would not require this conclusion. Despite that situation, this court cannot avoid the conclusion that Con *624 gress, for whatever reason, did not include an intermediate care facility in its definition of an 'institutionalized individual’. Therefore, the creation of the proposed trust does not involve the transfer of a resource which must be taken into account for the conservatee’s present qualification for Medicaid as a resident of an intermediate care facility.”
This analysis is countered by the New York State Department of Social Services as follows:
"The Court’s interpretation is flawed in two respects. First, it ignores the plain language of the statutory definitions of 'nursing facility’ and 'intermediate care facility.’ The definition of the former is found at 42 U.S.C. § 1396r (a) (1) and includes three subparagraphs, A-C, listed in the disjunctive. Thus one definition is:
"A) institution primarily engaged in providing to residents * * *
"B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons.
"The definition of an ICF is found at 42 U.S.C. § 1396 (d) and states it is 'an institution for the mentally retarded * * * if (1) the primary purpose of such institution * * * is to provide health or rehabilitative services for mentally retarded individuals.’
"As an institution providing rehabilitative services to one type of disabled person, an ICF falls within the definition of nursing facility.
"Furthermore, what the Aspinall court finds 'anomalous’ in the statutory definition of 'institutionalized individual,’ yet is willing to accept, in fact leads to an absurd reading of the statute, which is unaccepatble [sic] under basic tenets of statutory construction. (Reply Memo., Exhibit A at p. 5). The only rational interpretation of the inclusion of those described in § 1396 (a) (10) (A) (ii) (VI) as 'institutionalized individuals’ is that actual residents of ICF’s are included in some other part of the definition, i.e., in 'nursing facility,’ 42 U.S.C. § 1396p (c) (3). Any other interpretation results in the absurd conclusion that those who would require an ICF, but are receiving care at home or through community-based services are 'institutionalized’, but those actually in an ICF are not. Congress could only have intended that residents of an ICF fell within another part of the definition.
"Second, this reading of the statute is supported by the federal agency’s Medicaid Manual, a portion of which is *625 annexed to the State Commissioner’s Verified Answer at Exhibit A. Either the court in Aspinall was unaware of this manual, or perhaps made the same error as petitioners do at p. 6 of their Reply Memorandum in thinking this is a state publication, when, in fact, it is promulgated by the federal agency — the Department of Health and Human Services. It is beyond dispute that the interpretation of a statute by the agency charged with its administration is entitled to great deference. In this federal manual IGF services for the mentally retarded are specifically included in the definition of nursing facility services.”
With respect to these disputed statutory interpretations this court finds itself in agreement with Justice Fred T. Santucci. It is an extremely strained construction of 42 USC § 1396p (c) (3) which seeks to squeeze the term "intermediate care facility for the mentally retarded” into the term "nursing facility”. Aside from the conceptual and definitional distinctions noted by Justice Santucci in Matter of Aspinall (supra), is the very clear fact that Congress distinguished the two facilities in many provisions of title 42. It is extremely doubtful that on the single occasion represented by 42 USC § 1396p (c) (3) Congress, without any expression of such in intention, determined that the term "nursing facility” was to incorporate intermediate care facilities for the mentally retarded within its contemplation.
Rather, for whatever unarticulated reasons it may have had, Congress apparently determined to apply the rules regarding ineligibility for medical assistance for a period following transfer of assets for less than fair market value to individuals "with respect to whom there has been a determination that but for the provision of [qualifying] home or community-based services * * * they would require the level of care provided in a[n] * * * intermediate care facility for the mentally retarded” (42 USC § 1396a [a] [10] [A] [ii] [VI]), but not for those individuals who actually are institutionalized in intermediate care facilities for the mentally retarded.
Notwithstanding this conclusion that Congress has enacted no statutory bar to establishment of a supplemental needs trust for the conservatee, Kristen Cangelosi, the court is nevertheless constrained to deny the instant application.
The recently enacted paragraph (c) of EPTL 7-3.1 provides: "A provision in any trust, other than a testamentary trust, which provides directly or indirectly for the suspension, termi *626 nation or diversion of the principal, income or beneficial interest of either the creator or the creator’s spouse in the event that the creator or creator’s spouse should apply for medical assistance or require medical, hospital or nursing care or long term custodial, nursing or medical care shall be void as against the public policy of the state of New York, without regard to the irrevocability of the trust or the purpose for which the trust was created.”
The proposed supplemental needs trust before the court for consideration seems to fall within the proscription of EPTL 7-3.1 (c). The first paragraph of section 1.5 of the proposed supplemental needs trust (Purpose and Intent of Settlor) states, in part: "It is the Settlor’s intent that the beneficiary shall receive all government entitlements that the beneficiary would otherwise be entitled to but for distributions hereunder.”
The proposed supplemental needs trust’s declared purpose is to render the conservatee, Kristen Cangelosi, eligible for medical assistance for long-term custodial care, by diverting from her "ownership” of a principal sum which would otherwise be applied to the expense for her care in the intermediate care facility for the mentally retarded in the first instance.
It seems to this court that there should be no escape for the supplemental needs trust proposed herein from the public policy considerations articulated in EPTL 7-3.1 (c) because it is violative of public policy from its inception rather than coming into violation upon the happening of a future event. Its entire purpose is to divert a principal amount from the "ownership” of the conservatee, Kristen Cangelosi, to permit her to be eligible for Medicaid. It is this diversion of principal, to avoid its application to the expenses associated with the care of the conservatee, Kristen Cangelosi, and to thereby have the obligation for such expenses pass to Medicaid, which is the public policy issue involved in this matter. It is not, as the supplemental attorney’s affidavit in support of petition, sworn to on August 11, 1992, seems to suggest, the form of the trust, or the nature of the income payable to the conservatee, Kristen Cangelosi, which are the reasons for the court’s disapproval of the proposed supplemental needs trust.
The court further concludes that EPTL 7-3.1 (c) is not violative of the Federal statutes discussed above which allow a transfer of assets for less than fair market value for an individual in an intermediate care facility for the mentally *627 retarded without causing the imposition of a period of ineligibility for medical assistance. EPTL 7-3.1 (c) does not forbid transfers for less than market value. Its application, in a case such as this, is limited to the use to which such transferred funds are put. As applied herein EPTL 7-3.1 (c) certainly has a rational basis. The proposed supplemental needs trust, while causing the transfer of the funds in a legal sense away from the conservatee, Kristen Cangelosi, has the very real and practical effect of preserving these funds for her. She then would be in a position of receiving publicly funded Medicaid benefits while preserving and enjoying the benefit of a significant principal sum. This is inconsistent with the concept of the payment of Medicaid to or for the benefit of individuals in need. The enactment of EPTL 7-3.1 (c) in no way addresses such other transfers as the Federal statutes would allow and therefore does not violate those statutes.
As commentators have observed (e.g., Danzig, Using Supplemental Needs Trusts in Structured Settlements, NYLJ, Aug. 28, 1992, at 1, col 1; Vassiliou, The Case for Supplemental Needs Trusts, NYLJ, July 28, 1992, at 1, col 1), there has been a general tendency in the courts to disapprove the creation of supplemental needs trusts. This reluctance to approve supplemental needs trusts, which transfer a fund from an individual, or from others legally obligated to support an individual, simply to make the individual eligible to receive publicly funded medical assistance and preserve a large fund for the individual’s private enjoyment is founded in the public policy considerations which prompted the New York State legislation to enact EPTL 7-3.1 (c).
Accordingly, consistent with what this court views as the public policy of the State of New York as declared by the Legislature, and as suggested by other courts, at least by implication (e.g., Matter of Gonzalez, 154 Misc 2d 633 [Sup Ct, Nassau County] [Wager, J.]), this application is denied.

 During the pendency of this proceeding the conservatee’s remaining funds have been expended. However, in an affidavit sworn to August 11, 1992 counsel for the petitioners has advised that "a nunc pro tune order would allow kristen cangelosi to receive Medicaid retroactive to the date of the SSI application, as her SSI appeal is still pending before the Social Security Administration.”